## 2310 MADISON AVENUE, INC. *v.* ALLIED BEDDING MANUFACTURING CO., INC.

[No. 118, October Term, 1955.]

400

*Decided March 16, 1956.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Donald M. Rothman,* with whom were *Gordon, Feinblatt & Rothman* on the brief, for appellant.

*John J. Ghingher, Jr.,* with whom were *Weinberg & Green* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court.

Twice within a month water leaked from an upper floor, leased to one tenant, upon merchandise on the first floor belonging to another tenant with whom the landlord had covenanted in writing to keep the roof and downspouting of the building in good order and repair. A jury found the owner of the two story building liable for the damage caused to the merchandise on each occasion and exonerated a former tenant of the second floor, brought into the case by the landlord on the theory that it had clogged drains and so brought about the conditions that caused the leaks. The landlord appealed both of the judgments—that against it and that in favor of the former tenant, and then dismissed the latter appeal. We are asked to reverse the judgment against the landlord on the grounds that the trial court wrongly refused to direct a verdict on the claim set forth in each of the three counts of the declaration, and for errors claimed to have been made in the charge to the jury.

There was testimony from which the jury could have found the following to have been the facts. In 1946 the landlord, 2310 Madison Avenue, Inc., purchased the building at that address in Baltimore, which had been built for, and originally used as, a garage. By lease dated August 30, 1951, it let to Allied Bedding Manufacturing Co., Inc. the ground floor of that building. The second floor had been let to the Maryland School of Building Trades, Inc. in 1949, but in the middle of September 1951, the school vacated and the second story was then let to Bankert Hudson Company as a storeroom for automobiles. On November 7, 1951, after a rainstorm, water leaked through the second floor to the first floor, damaging goods of Allied stored there. A plumber was sent

by the landlord to find the source of the trouble; he inspected the downspouting, found that no water had leaked through the joints or backed up over the roof, and thereupon advised small repairs to the roof which were made immediately. About three weeks later, after another rainstorm, water again came from overhead to the first floor and caused more extensive damage to Allied's goods. The same plumber again was sent by the landlord to investigate the trouble. This time he discovered that there was a drain in the floor of the upper story that had been covered with concrete. Sand was found in the pea trap underneath the drain. This led to an investigation of a horizontal pipe under the first floor that was common to the vertical pipe from the second floor drain and to downspouts or rain leaders from the roof. This pipe was found to be tightly packed with sand. It then became known that relatively small amounts of water could seep through the sand, but when the downspouts or rain leaders discharged too much water, it could not pass through fast enough and pressure developed that caused the water to back up the vertical pipe to the drain in the second floor. There the pressure forced up the concrete cover over the drain enough to allow the water to come out onto the second floor. Then the concrete cover would settle down again, like a check valve, and prevent the water from flowing back down the drain. The first floor was torn up and some of the drain pipe opened. Special electrically operated pipe cleaning equipment had to be brought in to clear the sand from the clogged pipes. The Maryland School for Building Trades, Inc., which taught brick-laying, had used sand in its work and there was testimony that it flushed this sand down the drain as a regular practice, although this was denied. The school itself had cleaned sand from the drain on the second floor on one or more occasions and, during its tenancy, water had once or twice backed up in the same manner as it did on the occasions here involved. As a result, the school covered the drain with concrete in 1949 and no one had noticed water on the floor in the

vicinity of the drain since that time, until the occasions here in question. There was testimony from an employee of Bankert Hudson, that in the fall of 1951, there was water on the second floor deep enough to require one to wear rubbers or galoshes on a number of occasions when he visited there. This is flatly denied by another employee of Bankert Hudson, who went there as frequently as the first witness during the same period of time or more frequently. No one testified that the presence of water near the drain was ever reported to the landlord, nor was it shown that it ever knew of it before the first leak in November 1951. The president of Allied visited the property several times a week after the tenancy began and never saw water or evidence of water before the first leak. When it happened, he called American Realty Company, managing agents of the property, and spoke to Mr. Samuel Kalis, one of its officers (and also a stockholder of the landlord), and told him that the roof was leaking. Mr. Kalis conveyed this message to Mr. Isadore Abrams, an officer and a stockholder of the landlord, who went to the premises to check the trouble. When he arrived, he found a pool of water on the second floor of the building and, with a rapidly recruited laboring force, bailed it out. Mr. Abrams called a plumber, a Mr. Snyder, who found no water when he arrived although Mr. Abrams told him where it had been and how much had been there. Mr. Snyder inspected the water pipes, the downspouting and the rain leaders and discovered no defects. He recommended that the roof be thoroughly checked. This was done and the roof man recoated a small valley. Mr. Snyder testified that on the first visit there were no special circumstances to cause him to suspect that the water came from below to the second floor, since the leak had been reported as from the roof, and water usually comes down, and that therefore he had not gone down to the first floor on his first visit. Some three weeks after the first trouble, Allied's president again notified American Realty Company that water was coming through the ceiling. This was

on Saturday afternoon, and on Monday morning the roofer and the plumber were again on the job. Mr. Snyder says that on this occasion he saw the pool of water on the second floor but at first could see no evidence of how it could have originated. It was where he had been told it was on the first occasion. Then he noticed a low spot in the middle of the floor in which there was a slight movement. He asked to be taken to the floor below and there saw a four inch cast iron soil pipe, with a pea trap, going up to the ceiling. This drain line from the pea trap ran across the ceiling to a wall, down the wall and underground. He then returned to the second floor and chipped away the concrete cover to find the drain and the clogged pea trap. Mr. Snyder says that when he saw the pea trap and drain line coming down to an underground clear water drain, he immediately jumped to the conclusion, which he subsequently found correct, that the drain pipe from the second floor and the rain leaders from the roof "were tied together in a common drain." He said that the only way to have found that the drains were clogged was by taking them up, as he did. He described downspouting and rain leaders as the same thing except that downspouts are usually outside a building and made of one metal, and rain leaders are inside the building and made of another metal. He said that drain lines run horizontally to the sewers and are the pipes into which the downspouts and rain leaders empty. The plumbing code distinguishes between them and downspouts and rain leaders. On one occasion Mr. Kalis saw the school hosing down the second floor. The drain was uncovered in 1946 when the building was bought. All of the drainage system of the building was inside. There had been no complaints of any water, nor had the landlord known of any water trouble whatever, except once, a year and a half or two years before November, 1951, when rain came through a wall quite far removed from the drain.

The declaration was in three counts: the first, for breach of the covenant of the lease to keep the roof and

downspouting "in good order and repair"; the second, for negligence in failing to prevent or correct a defective and clogged condition of the downspouting and rain leaders; and the third, for that the landlord, aware of the purpose for which Allied intended to use the premises, that is, for the storage of bedding, leased the premises knowing that the downspouting and rain leaders then were in a defective and clogged condition and knowing that Allied was unaware of that condition, without informing them as to it.

The appellant urges that a verdict should have been directed on the first count because a covenant to repair is never implied, and where there is a covenant to repair, there must be actual notice of the particular repairs needed, coupled with failure to make such repairs within a reasonable time after that notice, before the landlord becomes liable. It says that the damage on neither occasion was due to any defect in "the roof and downspouting", which were the only things it had covenanted to keep "in good order and repair". It goes further to say that even if the covenant to repair the downspouting "is stretched to include the drain system", there is uncontradicted evidence that no notice was given it that the drain system was out of order and in need of repair.

In support of the motion for a directed verdict on count two of the declaration, appellant makes two points—the first is that where a landlord's contract to repair is broken, the remedy is actually and only for negligent failure to make repairs agreed upon, on a showing that damage resulted to the tenant from such failure, and that, as in count one, actual notice of the particular defect is necessary before the landlord can be held liable. The second point is that this is not a case within the principle that where the landlord retains control of part of the premises, or of appliances or equipment used in common by various tenants, he is liable for injuries to a tenant of part of the building or to the property of that tenant, caused by his neglect to remedy defects in the portions of the building, or appliances or equipment, over which he retains control.

The point is grounded on the argument that the rain leaders and the horizontal drain under the first floor are neither parts of the building nor appliances or equipment over which the landlord retains control.

Finally, it is said that even if the duty of the landlord to keep the drain in good repair be assumed, there was no actual notice as to its defective condition and no constructive notice, since the cause of the damage was so unusual as not to have been foreseeable nor discovered by inspection, being comprised, as it was, of the combination of sand in pipes under the floor, a cement cover over a drain and extraordinary rains.

As we read the record, the trial court was right in refusing the motion for a directed verdict as to counts one and two of the declaration, since under either of two principles of law—the first, negligent failure to comply with the contractual obligation to repair, and the second, lack of due and ordinary care in maintaining and repairing appliances or equipment under the control of the landlord—there was evidence permitting a jury to find for Allied for the damage occurring on the second occasion. We think there was no evidence sufficient to permit recovery for the damage done on the first occasion. No instruction was asked directing the jury to find for the landlord as to the damage from the first leaking, and if we did not find that reversal was required for other reasons, under the rules we would not reverse for matters not claimed or ruled on below. See *Richardson v. Boata,* 207 Md. 301-306. However, we think, for reasons given later, that the evidence was insufficient to permit recovery under the third count of the declaration. Under the instructions given, the jury could have and may have found for the appellee Allied on the allegations of that count and, therefore, the case must be reversed and remanded for a new trial.

We turn, then, to our views as to liability under the first and second counts of the declaration. In *McKenzie v. Egge,* 207 Md. 1, 6, Judge Henderson, for the Court, aptly summarized the pertinent Maryland law as follows:

"It is well settled in Maryland that under certain conditions, a tenant may maintain an action for injuries sustained as a result of a defect in rented premises, despite the absence, at common law, of an implied covenant to repair or a warranty of the fitness for occupancy of leased premises. These conditions are, that there be a contractual undertaking to make repairs, notice of the particular defect, and a reasonable opportunity to correct it. Where these conditions are met, there arises an obligation to use reasonable care to make the repairs, for the negligent breach of which there is a tort liability, subject to the usual rules as to proof of causation and the absence of contributory negligence on the part of the tenant. *Thompson v. Clemens,* 96 Md. 196; *Pinkerton v. Slocomb,* 126 Md. 665; *Robinson v. Heil,* 128 Md. 645; *Edelman v. Monouydas,* 186 Md. 479; *King v. Compton,* 187 Md. 363." In the case at bar, there was a covenant to keep the roof and the downspouting in good order and repair. We think this properly can be read as an obligation of the landlord to provide a roof that would keep out the water, and piping which would carry roof water to the storm sewer, and that the horizontal drain, which became clogged with sand, was a part of the drainage system fairly encompassed by this covenant. We think, too, that there was notice of the particular defect and a reasonable opportunity to repair it. The tenant notified the landlord that water was coming through the ceiling from the floor above at a particular location. The landlord's agent saw where the water was. It is not necessary that the tenant point out the causes of the defect. It was enough here for the landlord to be given notice of the nature of the trouble and its location. Clearly there was ample opportunity to remedy the trouble between the first and second occurrences. In this aspect of the case, counts one and two allege similar causes of action and there was sufficient evidence in support of the allegations of both, to permit a jury properly to find that the landlord was liable in tort to Allied for the damages caused on the second occasion by negligent failure to repair a defect of

which it had notice and which it had contracted to repair, if notified. The conditions which impose liability under this theory of the law were not present as to the damage incurred on the first occasion, there having been no notice of any defect before the happening of November 7, and the landlord would have been entitled to a directed verdict on that issue if one had been requested.

Even if there had been no promise to maintain and repair the drainage system there was evidence to support a finding that the landlord did not use the reasonable care required of it by the law in maintaining appliances within its control, after notice on November 7, 1951, of defects in them. In *McKenzie v. Egge, supra,* Judge Henderson went on to say: "Where parts of an apartment dwelling are retained under the control of a landlord, for the common use of tenants, the landlord is under an implied duty to use reasonable diligence to keep the portions retained in a safe condition. *Ross v. Belzer,* 199 Md. 187, and cases cited." The principles underlying the quoted statement go further. In *Kinnier v. Adams, Inc.,* 142 Md. 305, the landlord was held liable for damage to goods of a tenant on the lower floor caused by the bursting of a water pipe on an upper floor leased by the owner to another tenant. The court adopted as a statement of the law the following quotation from Tiffany, *Landlord and Tenant,* Vol. 1, p. 641-6: " 'The landlord is liable for injuries to a tenant, as to any other person rightfully on the premises, caused by the former's neglect to remedy defects in, or by his improper management of, appliances of which he retains control. Accordingly he has been held liable for injuries caused by leakage from water pipes or other plumbing attachments in his control, or by overflow from such attachments * * *.' " The holding was reaffirmed in *Commercial Realty Co. v. National Distillers Products Corporation,* 196 Md. 274. There the valve on the pipe the landlord negligently failed to turn off was in the premises of the tenant. It was held that this did not relieve the landlord from liability for water coming from the floor above from a pipe which

had burst. See, too, *Beck & Co. v. Hanline Bros.,* 122 Md. 68. Many cases in other jurisdictions are to the same effect. In *Kendall v. Tashjian* (Mass.), 155 N. E. 4, a roof gutter broke and became clogged with dirt, causing water to overflow and run down the building to a place where bricks were loose, and then through the ceiling to the first floor, where it damaged goods. It was held that the roof, the gutter, and a conductor from the gutter to the ground, were within the control of the landlord and that he owed a duty of reasonable care in maintaining them. See also *Priest v. Nichols,* 116 Mass. 401, 406-7, 416; *Sullivan v. Northridge* (Mass.), 141 N. E. 114; *Toole v. Beckett,* 67 Me. 544; *Queeney v. Willi* (N. Y.), 122 N. E. 198; *Levine v. Baldwin,* 84 N. Y. S. 92; *Pignatario v. Meyers* (Conn.), 123 A. 263; *Wardman v. Hanlon,* 280 F. 988; *Martindale Clothing Co. v. Spokane & Eastern Trust Co.* (Wash.), 140 P. 909; *Restatement, Torts,* Sec. 360 and 361; *Law of Torts, Prosser,* 2nd Ed., Sec. 80, p. 471. The cases are collected in annotations in 13 A. L. R. 837, 26 A. L. R. 1253, and 52 A. L. R. 864.

Where the landlord has an obligation to make repairs to appliances or equipment under his control, he cannot escape responsibility by delegating the making of the repairs to an independent contractor. *Kinnier v. Adams, supra; Restatement, Torts,* Sec. 421; *Law of Torts, Prosser,* 2nd Ed., *supra,* Sec. 80, p. 476. See also *E. Candia & Co. v. Rubin,* 204 N. Y. S. 590; *Cadby v. Hill* (N. Y.), 132 N. E. 104; *Levine v. Baldwin, supra.*

The appellant says that it used ordinary care in maintaining the drainage system and that an inspection of the premises would not have revealed the defect which could only have been found by taking up the concrete floor and opening the pipes. We think that the appellant is right up to the time of the first occurrence. There is no evidence to show that before then it knew of the defect in the drainage system, nor that it had knowledge of facts or circumstances which should have led it to become aware of the defect. An inspection, except at the time of a heavy rain, would not have revealed the potentially

dangerous condition, and not then, unless attention were directed to the area of the second floor drain. An inspection of all of the drainage system that could be seen without tearing up the floors would have shown the downspouting to be in sound condition. "The obligation is one of reasonable care only, and the lessor is not liable where no injury to anyone was reasonably to be anticipated, or the condition was not discoverable by reasonable inspection * * *." *Law of Torts, Prosser,* 2nd Ed., *supra,* Sec. 80, p. 472. The position of the landlord as to the second occurrence is different. The testimony makes it clear the jury could have found that had the plumber exercised the same diligence and alertness on the first occasion that he did on the second, he would have jumped to the same conclusion that finally he did, and then would have located and corrected the trouble. He satisfied himself on the first occasion that water was not coming from above but not that it did not come from below. The backing up of water in pipes is not uncommon. He was told of the location of the water on the second floor and if he had checked the floor below under that location, he would have found the source of the trouble, as he later did. The agents of the landlord knew of the drain, even though it had been covered by concrete and they may have overlooked it. We think there was enough to permit the jury to find that the landlord was negligent in failing to repair a defect in an appliance over which it retained control after being put on notice of a defect in it. Courts have reached similar conclusions under analogous circumstances in the cases we have cited heretofore. In *Levine v. Baldwin, supra,* 84 N. Y. S. 92, the facts are similar. There the plaintiff was a tenant of part of the premises, a store on the first floor and the basement under it. Water pipes carried rain from the roof through the floors into the basement. At the top of the basement floor, one of the downspouts entered a drain pipe which ran through the basement into a sewer in front of the building. In May there was water in the basement. The landlord was notified and sent a plumber who could not

discover the cause of the water, although he suspected the drain pipe. In July there was another leak. Again a plumber was sent and came to the conclusion that the overflow of water was caused by the storm sewer being over-charged as a consequence of heavy rains and backing up into the premises. Subsequently, there was another overflow of water in the basement and another plumber was sent to investigate. He concluded that the overflow came from beneath the floor of the cellar. The floor was taken up and near the wall of the building was found an unused trap sealed up with a piece of sheet lead, in which had developed a hole three or four inches wide. The Court said: "As the case then stood, the jury might have found, upon the proof, that the defect in the pipe, to which the overflow of water in the basement might be attributed, was something that had existed for some months; that it might have been discovered by proper and sufficient examination; and that the defendant, after notification that water flowed into the basement, had failed to make or cause to be made such proper and sufficient examination; and, if they so found, the defendant would have been chargeable with negligence, and liable for the damages sustained by the plaintiff. This draining apparatus or appliance was not part of the demised premises in the occupation of the plaintiff. It was something used for the benefit of the whole building. It drained the water from the roof, and the defect in the pipe at the trap, according to the testimony of the plaintiff, was at an elbow where two pieces of pipe came together and formed a corner, and one of those pieces making this elbow was that which ran along the inside wall from the end of the building; and thus the point at which the defect was discovered was in the pipe with which the leader from the roof was connected, if the testimony of the plaintiff, who was present when the defect was discovered, is to be believed. The rule of liability to be applied here is that which obtains in cases in which a landlord is responsible for injuries sustained by tenants through negligence in or upon those parts or appurte-

nances of demised premises which remain under the charge and control of the landlord. That liability arises after notice, and such notice was given in ample time to have the defect repaired before the last overflow, which caused the injury to the plaintiff's goods, happened." We think the quoted language is entirely applicable to the case at bar.

The recital of the evidence and the expression of our views as to the first occurrence, make it plain that we find, as we have indicated earlier, there was no liability of the landlord under the third count of the declaration, that is, under the allegations that the landlord, knowing of the defect at the time of the execution of the lease, failed to disclose it to the tenant. This being so, the landlord was entitled to, and should have received, as requested, a directed verdict as to the third count.

The appellant made two exceptions to the charge which require attention. The first was that the jury should have been, and were not, told that under the covenant of the lease, actual knowledge of the particular defect complained of was essential to the landlord's liabiilty. We think the charge adequately covered this point. The jury was told that if the loss happened "through failure, after notice" to keep in repair, the landlord was liable, provided it had "due notice of the condition involved". The second exception was to the failure to instruct the jury that if the drain backed up "on account of the extraordinary amount of rainfall in November, 1951, and that the said overflow could not have been anticipated and prevented by the exercise of ordinary care; and * * * that immediately upon receiving notice of the overflow", the landlord "took proper steps to prevent any further injury or damage", then Allied was not entitled to recover. The only evidence of extraordinary rainfall was a report from the weather bureau which was put into evidence without explanation. On the other hand, there was testimony by several witnesses that the rainfall was heavy but not unusual. We think the evidence insufficient to require the court to charge the jury as to a rainfall

so extraordinary as to exonerate the landlord from liability, after it was on notice as to the effect of heavy rain by reason of the first occurrence.

For the reasons indicated, we find it necessary to reverse the case and remand it for a new trial on the question of the landlord's liability to Allied for the damages resulting from the second leakage of water under counts one and two of the declaration.

*Judgment reversed, with costs, and new*
*trial awarded.*