811 A.2d 881

William H. SMITH

v.

DODGE PLAZA LIMITED PARTNERSHIP, et al.

No. 2400, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Dec. 3, 2002.

L. Palmer Foret (Holtz & Foret, LLC, on the brief), Chevy Chase, for appellant.

David R. Kinsley (Law Offices of John W. Sheldon, on the brief), Baltimore, for appellees.

Argued before LAWRENCE F. BARBERA RODOWSKY (retired, specially assigned), ROBERT F. FISCHER (retired, specially assigned), JJ.

RODOWSKY, Judge.

In this case we affirm a summary judgment entered in favor of the landlord of nightclub premises on the claim by a patron of the nightclub that the landlord's negligence caused the patron to be stabbed while inside the nightclub.

By a written lease dated February 8, 1991 (the Lease), the principal appellee, Dodge Plaza Limited Partnership (Dodge Plaza), leased an 8800 square foot store unit in its strip shopping center at 7752 Landover Road, Landover, Maryland, to certain individuals who subsequently assigned the Lease to Reid & Springs, Inc.[1] The general partners of Dodge Plaza also own and manage other investment properties in other

---

1. Summary judgment was also granted in favor of the second appellee, Yadin Realty Co. The record is uncontradicted that Yadin Realty Co.'s sole connection with the demised premises was to act as the broker which brought together the original parties to the Lease. Consequently, we also affirm the judgment in favor of Yadin Realty Co. *Dyer v. Otis Warren Real Estate Co.,* 371 Md. 576, 810 A.2d 938, (2002).

legal entities, the majority of which lie within the Capital Beltway. Their business office is located 1.7 miles from the subject shopping center.[2]

The Lease included the following provisions:

*"ARTICLE TEN. USE OF DEMISED PREMISES*

"A. Tenant covenants and agrees that during the term hereof the demised premises will be used solely for the purpose of a *Banquet Hall, Disco Club* and no other purpose whatsoever.

"Tenant agrees that the operation of its night club in the demised premises shall be consistent with the operation of a first class night club in the Metropolitan Washington, D.C. area. Tenant agrees to use whatever procedures may be necessary to maintain such a first class operation, including but not limited to the employment of security personnel, and construction of signage of such size and visibility as to be clear to all its customers. The signage shall describe prohibited activities within the demised premises and within the shopping center, which prohibited activities shall include, but not be limited to[,] sale or use of illegal substances by customers or employees, drunkenness, fighting, assaults and shootings, and customers loitering outside of the demised premises in groups of five or more for more than 10 minutes at a time. Tenant shall be strictly responsible for the occurrence of any prohibited activities irrespective of fault of Tenant."

---

**2.** This fact is contained in the deposition, taken by Smith, of Arnold Berlin, a general partner of Dodge Plaza. That deposition was taken May 5, 1999, but had not been transcribed by May 21, 1999, when the hearing on the motion for summary judgment was held. Consequently, the Berlin deposition is not part of the original record. Smith, however, has included the deposition in his record extract.

We have exercised our discretion to consider the Berlin deposition because:

1. Dodge Plaza was represented at the deposition;

2. Smith's security expert, whose affidavit is in the record, recites in that affidavit that he considered notes of the Berlin deposition in arriving at his conclusions; and

3. Nothing in the Berlin deposition materially alters the conclusion by the circuit court.

The tenant agreed to open for business by June 1, 1991, and to operate under the name, "Rhythms." In this opinion we shall refer interchangeably to the tenant and to the business conducted on the demised premises as "Rhythms."

The term of the written lease to Rhythms expired February 28, 1994. Rhythms, however, continued in possession. Article Twenty-three of the Lease addressed the tenant's holding over. It reads:

"In the event that tenant shall hold over after the expiration of this lease, the tenancy created by such holding over shall be a month to month one, but in all other respects shall be governed by the terms of this lease ... and provided, further, in all cases, thirty (30) days' notice shall be required to terminate the tenancy created by such holdover."

The appellant and plaintiff below, William H. Smith (Smith), represented to the trial court in his memorandum in opposition to Dodge Plaza's motion for summary judgment that on June 10, 1995, while "an invitee at Rhythms nightclub, [he] was stabbed multiple times by another invitee during a musical performance by the ... band, Rare Essence."[3] Rare Essence is described as a "Go–Go" band. In the instant action, filed in the Circuit Court for Prince George's County, Smith joined as defendants, in addition to the appellees, all individuals and entities associated with Rhythms and with Rare Essence, including the manager of Rhythms, Louis Herman King, Jr. (King).

Summary judgment was granted in favor of the appellees based on Smith's lack of any evidence of, or indeed, of any sufficient allegation of, a cause of action in negligence. The claims against all other defendants, with the exception of King, were disposed of in the circuit court on grounds that are

---

**3.** The representations in Smith's memorandum are more detailed than his complaint. There is no affidavit by Smith in opposition to Dodge Plaza's motion for summary judgment and, if he was deposed, his deposition is not in the record before us. Nor is there a police incident report concerning Smith's stabbing that is in the record.

not material to this appeal. The claim against King, so far as the record before us indicates, remains open. The instant appeal from the judgment for the appellees was authorized by an order of the circuit court entered under Maryland Rule 2–602 in this multi-party case.

Smith contends that Dodge Plaza was on notice that there was a dangerous condition on the demised premises, particularly during performances of Rare Essence, that Dodge Plaza had a duty to patrons of Rhythms to exercise reasonable care to protect invitees from criminal assaults, but failed to do so, and that that failure proximately caused the injuries to Smith. Smith's breach of duty argument has two aspects. He submits, in reliance on *Matthews v. Amberwood Assocs. Ltd. Partnership,* 351 Md. 544, 719 A.2d 119 (1998), that Dodge Plaza should have exercised control by evicting Rhythms prior to June 10, 1995. He also contends, in reliance on the affidavit of his expert on security, that Dodge Plaza "failed in its responsibility to provide proper and adequate security." Dodge Plaza contends that it was not on notice, that it owed no duty, by contract or under tort law, to patrons òf Rhythms to protect against criminal assaults by other patrons, and that, if any duty were owed, there was no negligence on the part of Dodge Plaza that contributed to Smith's injuries.

### Facts

Smith produced no evidence that Dodge Plaza had actual notice of any incident of criminal violence against the person of anyone in Rhythms or on the shopping center parking lot that occurred prior to June 10, 1995, when Smith was stabbed. Smith did produce, however, a number of police incident reports, antedating Smith's stabbing, and records of the Prince George's County Board of License Commissioners (the Board) reflecting that the renewal of the liquor license for Rhythms, effective June 1, 1995, was conditioned on Rhythms' hiring off-duty, uniformed, Prince George's County police officers as security because of unruly or criminal behavior by patrons of Rhythms.

The relevant evidence is summarized below, in chronological order.

—March 21, 1993, a Sunday, between 0100 and 0200 hours—Fist fight in Rhythms between two males, apparently over a female. Victim took cab to hospital.

—May 6, 1994, a Friday, at 2150 hours—An unknown subject, who had been denied admission to Rhythms because he was wearing blue jeans, went to his vehicle on the parking lot, obtained a handgun, and "held it out so that" the Rhythms' security guard could see it.

—November 17, 1994—The Board sent a memorandum to a sergeant of the Prince George's County Police Department (PGPD) recommending that off-duty officers be assigned to patrol the interior and exterior of Rhythms.

—January 9, 1995, a Monday, at 0130 hours—A subject punched his right arm through a plate glass window in Rhythms, severely lacerating his arm.

—January 28, 1995, a Saturday, at 0315 hours—PGPD officers reported to the parking lot to assist in controlling a crowd of 500 to 700 disorderly persons. A gunshot was fired by an unknown subject. No one was injured. Approximately every five minutes the Rhythms' bouncers were putting out two people, but the manager was letting three more into the club.

—March 1, 1995—Kentland Civic Association wrote to the Board advising that it wanted to appear to challenge renewal of Rhythms' license.

—April 4, 1995—A PGPD lieutenant wrote to the Board advising it that on April 1, a Saturday, at 0355 hours, "there was another shooting in the parking lot area of" Rhythms. Among the lieutenant's requests were that the Board

"[r]equire at least nine off-duty, uniformed police officers to patrol the interior and exterior. Presently, the security detail used by the licensee does not patrol or intervene in activity in the parking lot."

—April 10, 1995, a Monday, at 0243 hours—A fight occurred on the parking lot in front of Rhythms involving numerous

combatants. The subject, "an [Metropolitan Police District of Columbia] officer," retrieved a weapon from his vehicle, fired it, and a person "was struck in the lower left leg as he fled the sound of gunfire." The wound was minor, and the victim was treated at a hospital and subsequently released prior to the preparation of the police incident report.

—May 1, 1995, a Monday, at 0127 hours—A patron was punched in the face in the men's room at Rhythms by an unidentified subject.

—May 1, 1995—The Kentland Civic Association and two other civic associations jointly wrote to the Board recommending approval of the renewal of Rhythms' license, as a result of a meeting with King who had represented that Rhythms would hire nine off-duty police officers when Rare Essence was performing, that Rhythms' security personnel were patting down "all patrons prior to their entry ... (male or female, as appropriate)," and that the security personnel were utilizing handheld metal detectors.

—May 3, 1995—The Board met in an administrative voting session and voted to renew Rhythms' license on conditions summarized hereinafter.

—June 1, 1995—The Board renewed the license for Rhythms on conditions that Rhythms employ six off-duty PGPD officers from 11 p.m. to 4 a.m. on Friday evenings when Rare Essence was performing. When Rare Essence was not performing, Rhythms was to employ four off-duty police officers from 11 p.m. to 4 a.m. The officers were to provide security on the interior and exterior of Rhythms.

—June 2, 1995, a Friday—Off-duty police officers were not permitted to work at Rhythms because they were unable to obtain necessary clearances from senior officers.

—June 6, 1995, a Tuesday—King is assured by one or more representatives of the PGPD that the required number of officers would be present on Friday, June 9, with a specific sergeant acting as supervisor.[4]

---

4. This fact is per an uncontradicted affidavit by a PGPD Lieutenant.

—June 9, 1995, a Friday—Three officers, *i.e.*, a lieutenant, a sergeant, and a corporal, who were "taking primary responsibility for recruiting officers to work while off-duty, were unable to secure the required number of off-duty officers for Rhythms, and the PGPD would not permit off-duty officers to work in less than the required numbers.[5]

—June 10, 1995, a Saturday, early morning hours—Plaintiff is stabbed.[6]

The Board held a hearing on July 12, 1995, at which it heard testimony from the police officer who had responded to the report of the stabbing of Smith. The officer testified that there were no uniformed police officers acting as a security force on June 10. The Deputy Chief Inspector for the Board and another police officer testified that no uniformed police officers were working as security on Friday, June 17 or on Friday, June 23, 1995. The Board revoked Rhythms' license on August 2, 1995.

Smith also produced the complaint in a lawsuit against Rhythms and Dodge Plaza that was filed on May 1, 1996, alleging that, on May 3, 1993, the two female plaintiffs had been stabbed on the parking lot by a third female, thereby culminating an altercation that had originated in Rhythms during a birthday party. There is no evidence that Dodge Plaza knew of this occurrence before the suit papers were served.

Rhythms sought judicial review by the Circuit Court for Prince George's County of the license revocation. That court stayed the revocation, presumably, pending hearing.[7]

---

5.  See note 4.

6.  The time of day on June 10, 1995, when the plaintiff was stabbed does not specifically appear in the record. Plaintiff's theory of the case, however, is that the dangerous condition at Rhythms existed on nights when Rare Essence was performing. Rare Essence performed on Friday nights. The June 1, 1995 license issued by the Board permitted the sale of alcoholic beverages, in conjunction with "[a]uthorized [l]ive [e]ntertainment," until 3 a.m. of the following day.

7.  See note 2.

Sometime prior to August 1, 1996, Dodge Plaza received a letter, apparently from the Maryland Comptroller of the Treasury, advising that Rhythms' sales tax license had been revoked. By letter dated August 1, 1996, Dodge Plaza wrote to King, referring to that fact and also stating that "we have reports that Rhythms' liquor license has been revoked...." Dodge Plaza requested, *inter alia,* "[a] description of the nature of [Rhythms'] current operation." Rhythms' response, if any, is not in the record. Rhythms fell behind in its rent and, on January 15, 1997, the Lease was terminated by mutual, written agreement. The unpaid balance of rent was approximately $40,000.

### Notice

Whether, simply because the above-described events occurred, Dodge Plaza should have known of them is a question that is substantially interrelated with the issue of the extent of Dodge Plaza's duty. In a closely related context the Court of Appeals has indicated that constructive notice may, depending on the facts, be sufficient to include protection from criminal violence within a landlord's duty to use reasonable care to protect tenants from injury in the common areas. *Scott v. Watson,* 278 Md. 160, 359 A.2d 548 (1976).

That case involved the murder of a residential tenant. The building was a multistory structure which had retail shops on the ground level and 290 apartment units occupying fifteen floors above that level. The murder occurred in a common area, an underground parking garage. In a period of approximately one and one-half years preceding the murder, fifty-six crimes against property and sixteen crimes against persons were reported to have been committed on or near the apartment premises. *Id.* at 163–64, 359 A.2d at 551. The Court

---

Smith also included in his record extract a portion of a website printout of an article appearing in the Metro section of *The Washington Post* on October 11, 1994. That article was not part of the original record nor part of the record at depositions of Dodge Plaza general partners which Smith included in the record extract. We do not consider the newspaper article.

was asked, under the Uniform Certification of Questions of Law Act, to opine on "[w]hether a duty is imposed upon the landlord to protect his tenants from criminal acts of third parties where he has knowledge of increasing criminal activity on the premises, or in the immediate neighborhood[.]" *Id.* at 168, 359 A.2d at 553. In response the Court said:

"The duty of the landlord to exercise reasonable care for the safety of his tenants *in common areas* under his control is sufficiently flexible to be applied to cases involving criminal activity without making the landlord an insurer of his tenant's safety. If the landlord knows, *or should know,* of criminal activity against persons or property *in the common areas,* he then has a duty to take *reasonable* measures, in view of the existing circumstances, to eliminate the conditions contributing to the criminal activity. We think this duty arises primarily from criminal activities existing on the landlord's premises, and not from knowledge of general criminal activities in the neighborhood. Every person in society is subject to the risk of personal injury or property damage from criminal activity, both inside and outside his abode. The risk obviously varies with the time and locale. Since the landlord can affect the risk only within his own premises, ordinarily only criminal acts occurring on the landlord's premises, and of which he knows *or should have known* (and not those occurring generally in the surrounding neighborhood) constitute relevant factors in determining, in the particular circumstances, the reasonable measures which a landlord is under a duty to take to keep the premises safe."

*Id.* at 169, 359 A.2d at 554 (emphasis of "reasonable" in original; other emphasis added).

In the case before us there were two instances of violence against patrons that occurred within Rhythms prior to June 10, 1995. One was on March 21, 1993, and the other on May 1, 1995. Neither involved a weapon, and the later incident is substantially counterbalanced by the withdrawal that same date by the three community associations in the locale of their opposition to a renewal of Rhythms' liquor license. We hold

that these two instances are legally insufficient, in and of themselves, to have put Dodge Plaza on constructive notice of a danger to patrons of criminal injury within Rhythms beyond that normally encountered in urban society.

For the sake of argument, however, we assume that the conditional renewal of the liquor license on June 1, 1995, which required Rhythms to employ off-duty police officers both within its premises and as security for the parking lot, at least created a jury issue of constructive notice on or about that date. This assumed issue of fact, however, is not material, as we explain below.

### Duty

In *Scott v. Watson* the Court of Appeals flatly held that "there is no special duty imposed upon the landlord to protect his tenants against crimes perpetrated by third parties on the landlord's premises." 278 Md. at 166, 359 A.2d at 552. Citing the principal cases decided up to that time (1976), the Court observed that "this is the general rule in other jurisdictions." *Id.*

The Court in *Scott* then said:

"The general rule is a subsidiary of the broader rule that a private person is under no special duty to protect another from criminal acts by a third person, in the absence of statutes, or of a special relationship. *See* Restatement of Torts (Second) § 315 (1965) (no duty to control third person's conduct so as to prevent physical harm to another unless a special relation exists between actor and third person, or between actor and the other)." [8]

*Id.*

In *Henley v. Prince George's County*, 305 Md. 320, 503 A.2d 1333 (1986), the Court affirmed summary judgment in favor of

---

8. Restatement (Second) of Torts § 314A presents the following as a not necessarily exclusive list of special relations: common carrier and passenger, innkeeper and guest, land possessor and the possessor's invitees, and custodian and a person in custody who is deprived of normal opportunities for protection due to the custody.

the landowner, Prince George's Community College, which had turned control over the premises involved in that case to Prince George's County. The claim was based upon the murder by a caretaker of a youth who had entered upon the premises. With respect to the liability of the owner the Court said:

> "When land is leased to a tenant, the law of property regards the lease as equivalent to a sale of the premises for the term. The lessee acquires an estate in the land, and becomes for the time being, both owner and occupier, subject to all of the responsibilities of one in possession, to those who enter upon the land and those outside of its boundaries. (Footnotes omitted)."

*Id.* at 337, 503 A.2d at 1342 (quoting *Prosser and Keeton on the Law of Torts* § 63, at 434 (W. Keeton 5th ed.1984)).

More recent decisions elsewhere are in accord. These cases hold that there was no duty on the part of landlords to provide security within the premises demised to tenants to protect employees or invitees of the tenants from criminal violence by third persons. Therefore, those cases necessarily hold that the relationship of landlord and tenant's-invitee does not give rise to a special duty. *See Sewell v. Hull/Storey Dev. LLC,* 241 Ga.App. 365, 526 S.E.2d 878 (1999); *Jackson v. Shell Oil Co.,* 272 Ill.App.3d 542, 208 Ill.Dec. 958, 650 N.E.2d 652 (1995); *Nickelson v. Mall of America Co.,* 593 N.W.2d 723 (Minn.App.1999); *Rummel v. Edgemont Realty Partners Ltd.,* 116 N.M. 23, 859 P.2d 491 (N.M.App.1993); *Dalzell v. McDonald's Corp.,* 220 A.D.2d 638, 632 N.Y.S.2d 635 (N.Y.App.Div.1995); *Craig v. A.A.R. Realty Corp.,* 576 A.2d 688 (Del.Super.1989).[9]

---

9. Nor, by virtue of the relationship, is there a special duty on a merchant to protect the merchant's business invitees from criminal conduct by third persons. *See Nigido v. First Nat'l Bank,* 264 Md. 702, 288 A.2d 127 (1972); *Moore v. Jimel, Inc. t/a Hightopps Bar & Grill,* 147 Md.App. 336, 809 A.2d 10 (2002); *Tucker v. KFC Nat'l Management Co.,* 689 F.Supp. 560 (D.Md.1988).

Smith's response to this rule of law is that *Matthews v. Amberwood Assocs. Ltd. Partnership*, 351 Md. 544, 719 A.2d 119, has extended the landlord's duties beyond common areas to include protecting against injury occurring within the demised premises, and that the holding in *Matthews* can be applied to the facts here. The property involved in *Matthews* was a residential apartment building. A sixteen-month-old child, the son of a social guest of one of the tenants, was killed by the host's pit bull, "Rampage." There was evidence that, within a period of nine months to one year preceding the child's death, Rampage had lunged at, or otherwise viciously behaved toward, maintenance personnel within, or attempting to enter, the tenant's apartment and that, when chained outside, Rampage regularly growled at children and, on at least one occasion, "snapped" at a boy who fled by climbing a fence. *Id.* at 549–50, 719 A.2d at 121. A clause in the tenant's lease prohibited tenants from having pets on the premises. The Court in *Matthews* reasoned that "[t]he principal rationale for the general rule that the landlord is not ordinarily liable for injuries caused by defects or dangerous conditions in the leased premises is that the landlord 'has parted with control,' *Marshall v. Price, supra,* 162 Md. [687,] 689, 161 A. [172,] 172 [(1932)]." *Id.* at 556–57, 719 A.2d at 125. Referring to Rampage as an "extremely dangerous condition in [the tenant's] apartment" the Court said that "[t]he landlord retained control over the presence of a dog in the leased premises by virtue of the 'no pets' clause in the lease." *Id.* at 558, 719 A.2d at 125.

The *Matthews* Court further reasoned that, "[i]n addition to the landlord's control and ability to abate the danger of a vicious pit bull in the leased premises, the foreseeability of the harm supports the imposition of a duty on the landlord." *Id.* at 560, 719 A.2d at 127. The Court presented a long list of legislation at state and municipal levels that classified pit bulls as vicious, thereby enabling the communities to control or ban the breed. *Id.* at 561 n. 4, 719 A.2d at 128 n. 4. The Court saw no principled basis on which to distinguish from the facts in *Matthews* its prior decision in *Shields v. Wagman,* 350 Md.

666, 714 A.2d 881 (1998), where the landlord was held liable for a pit bull attack on a business invitee in the common area of a strip shopping center and *"where the landlord had knowledge of the potential danger and the ability to rid the premises of that danger by refusing to re-let the premises.'"* *Matthews*, 351 Md. at 564, 719 A.2d at 129 (quoting *Shields*, 350 Md. at 668–69, 714 A.2d at 882). The Court said that "[t]he 'control' factor upon which the Court relied in *Shields* was not the traditional landlord control over common areas. Rather ... it was the landlords' control over the tenant's remaining in the leased premises." *Id.* at 565, 719 A.2d at 129.

In a clear effort to prevent reading too much into its *Matthews* opinion, the Court further said:

"We do not hold that a landlord's retention in the lease of some control over particular matters in the leased premises is, standing alone, a sufficient basis to impose a duty upon the landlord which is owed to a guest on the premises. This Court has employed a balancing test to determine whether a duty of reasonable care should be imposed in particular circumstances. '[U]ltimately, the determination of whether a duty should be imposed is made by weighing the various policy considerations and reaching a conclusion that the plaintiff's interests are, or are not, entitled to legal protection against the conduct of the defendant.' *Rosenblatt v. Exxon, supra,* 335 Md. [58,] 77, 642 A.2d [180,] 189 [(1994)]. In the instant case, the various policy considerations that need to be weighed are the general understanding that a tenant is primarily in control of the leased premises and the sanctity of a tenant's home, including her ability generally to do as she sees fit within the privacy thereof, against the public safety concerns of permitting that same tenant to harbor an extremely dangerous animal that will foreseeably endanger individuals inside and outside the walls of the leased premises, the degree of control maintained by the landlord, the landlord's knowledge of the dangerous condition, and the landlord's ability to abate the condition. We, like the majority of courts addressing this issue [landlord's

liability for pit bull attacks] in other states, believe that the balance should be struck on the side of imposing a duty on the landlord which is owed to guests on the premises." *Id.* at 565–66, 719 A.2d at 129. The opinion in *Matthews* then reviewed cases involving pit bull attacks.

In the instant matter, Smith in effect contends that the unidentified patron who stabbed him at Rhythms on June 10, 1995, should be equated with the pit bull in *Matthews*. The two situations are fundamentally different. *Matthews* dealt with a premises liability issue while the instant matter deals with liability for the criminal act of a third party. The known vicious propensities of Rampage in *Matthews* were equated by the Court with a dangerous physical condition on the premises. It was a dangerous condition that was specific to Rampage, and it had been identified as much as one year before the death of the child. Rampage's mere presence on the premises was a clear violation of the lease prohibition. If the tenant had been asked to remove Rampage from the premises and refused, the landlord could have terminated the lease, apparently well before the fatal attack. The unidentified human being who attacked Smith did not present a continuing, identified, dangerous condition on Rhythms' premises.

Nor is the purported control feature in the instant Lease, *i.e.*, termination for breach of a covenant, analogous to the absolute no pets prohibition in *Matthews*. In the covenant relied on by Smith, Rhythms agreed "that the operation of its nightclub in the demised premises shall be consistent with the operation of a first class nightclub in the Metropolitan Washington, D.C. area." Two assaults by fists in the period from March 21, 1993, to June 10, 1995, in a nightclub that features a live Go Go band and that is authorized to dispense alcoholic beverages until 3 a.m., are not a basis for evicting for breach of the above-quoted Lease provision.[10]

---

10. Because Smith was stabbed within Rhythms, we have no need to opine on the duty, if any, of Dodge Plaza to protect patrons of Rhythms from the criminal conduct of third persons on the common area parking lot in the early morning hours.

The instant matter is also fundamentally different from *Matthews* with respect to the *Matthews* Court's foreseeability analysis. Injury to a tenant or social guest of a tenant as a result of continuously maintaining a vicious animal on the demised premises (and in the common areas) is foreseeable. Crime, also, is foreseeable, but not in the same sense as in *Matthews*. In *Scott*, the Court of Appeals "decline[d] to impose a special duty on a landlord to protect his tenants from criminal activity since to do so would place him perilously close to the position of insurer of his tenant's safety." *Scott*, 278 Md. at 167, 359 A.2d at 553. Were we to interpret *Matthews* as creating a special duty on landlords to protect tenants' invitees from criminal activity on the demised premises, we would, even more closely than "perilously," convert a landlord into an insurer.

Further, applying to the instant matter the balancing approach of *Matthews*, under which the foreseeable risk is compared to a number of factors, including "the landlord's ability to abate the condition," *Matthews*, 351 Md. at 566, 719 A.2d at 129, leads to the conclusion, as a matter of law, that there was no duty on Dodge Plaza to terminate the Lease sufficiently in advance of June 10, 1995, to have prevented the stabbing of a patron in Rhythms on that date. In *Scott*, in the course of holding that the landlord's duty to protect tenants from injury in the common areas could be applied, under appropriate circumstances, to protection from criminal activity, the Court said: "Every person in society is subject to the risk of personal injury or property damage from criminal activity, both inside and outside his abode. The risk obviously varies with the time and locale." *Scott*, 278 Md. at 169, 359 A.2d at 554. In the instant matter, exercising the control device of evicting the tenant must be balanced against the contractual allocation to Rhythms of the risk of inadequate security, the fact that Rhythms was providing private security within the nightclub, the uncertainty that anyone would be criminally assaulted with a weapon among a crowd of hundreds at any given Rare Essence concert; the total loss of income to the tenant by an eviction, when, under the new

license, it had attempted to arrange for off-duty police officers to provide security; the cost to the landlord of a court imposed tort duty to provide security, and the loss of legitimate entertainment by hundreds of patrons.

We strike the balance against imposing a duty on Dodge Plaza to have "controlled" the demised premises by closing the nightclub prior to June 10, 1995.

The Supreme Court of California applies a balancing approach in determining the scope of duty in the subject class of cases. *See Ann M. v. Pacific Plaza Shopping Ctr.*, 6 Cal.4th 666, 25 Cal.Rptr.2d 137, 863 P.2d 207 (1993) (en banc). There the plaintiff, a clerk in a photo shop, leased from the defendant in its shopping center, was raped in the photo shop. She contended that the landlord owed a duty to provide security in the common areas and that the breach of that duty proximately caused the criminal assault. The plaintiff proved that prior bank robberies, purse snatchings, and one instance of a man's pulling down a woman's pants, had occurred in the shopping center. The court "recognized that the scope of the duty is determined in part by balancing the foreseeability of the harm against the burden of the duty to be imposed." 25 Cal. Rptr.2d at 145, 863 P.2d at 215. Elaborating on that analytical framework, the court said:

"While there may be circumstances where the hiring of security guards will be required to satisfy a landowner's duty of care, such action will rarely, if ever, be found to be a 'minimal burden.' The monetary costs of security guards is not insignificant. Moreover, the obligation to provide patrols adequate to deter criminal conduct is not well defined. 'No one really knows why people commit crime, hence no one really knows what is "adequate" deterrence in any given situation.' Finally, the social costs of imposing a duty on landowners to hire private police forces are also not insignificant. For these reasons, we conclude that a high degree of foreseeability is required in order to find that the scope of a landlord's duty of care includes the hiring of security guards. We further conclude that the requisite degree of foreseeability rarely, if ever, can be proven in the absence of

prior similar incidents of violent crime on the landowner's premises. To hold otherwise would be to impose an unfair burden upon landlords and, in effect, would force landlords to become the insurers of public safety, contrary to well established policy in this state."

*Id.* at 145–46, 25 Cal.Rptr.2d 137, 863 P.2d at 215–16 (citations and footnote omitted).

The California court concluded that violent criminal assaults were not sufficiently foreseeable to impose a duty on the landlord to provide security guards in the common areas. *Id.* at 146, 25 Cal.Rptr.2d 137, 863 P.2d at 216. This was because the plaintiff had not offered evidence that the landlord had notice of prior incidents and because the prior incidents that had occurred were not similar in nature to the violent assault suffered by the plaintiff.

The balancing approach illustrated by the Supreme Court of California in *Ann M.* seems to be consistent with the holding of the Court of Appeals in *Matthews.* *Ann M.* reinforces the conclusion that we have reached above when applying a balancing test. In the case before us there was no evidence of any assaults, prior to June 10, 1995, on the Rhythms' premises involving use of a knife or gun. The prior instances of an assault by one patron on another patron were with fists.

Smith also contends that summary judgment is defeated by the affidavit of his security expert, William Brill (Brill).

Since 1973 Brill has headed a "firm that has provided security planning and analysis services to federal agencies, state and local governments, and to private corporations, such as apartment owners and shopping center developers and managers." Brill opined that Dodge Plaza "had the responsibility to make sure that proper and adequate security was provided at a nightclub such as Rhythms...." He based this opinion on the police incident reports, Board records, and suit papers that we have reviewed above and which we have found to be insufficient to impose a duty in tort on Dodge Plaza to protect from the criminal activity of third persons the patrons

of Rhythms within its premises. Brill's opinion of the law does not alter that legal result.

Brill also stated that it is "customary for a commercial landlord to take reasonable steps to insure that adequate security is provided by its tenants." The statement is entirely conclusory. Brill furnishes no facts or specific examples to support the asserted custom.

It is well established that " 'an expert's opinion is of no greater probative value than the soundness of his reasons given therefor will warrant.' " *Surkovich v. Doub*, 258 Md. 263, 272, 265 A.2d 447, 451 (1970) (quoting *Miller v. Abrahams*, 239 Md. 263, 273, 211 A.2d 309, 314 (1965)). An expert opinion 'derives its probative force from the facts on which it is predicated, and these must be legally sufficient to sustain the opinion of the expert.' *State Health Dep't v. Walker*, 238 Md. 512, 520, 209 A.2d 555, 559 (1965). *See also Jones v. State*, 343 Md. 448, 682 A.2d 248 (1996) (expert testimony by police officer that he was able to identify crack cocaine by touch was nothing more than a conclusion); *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 625 A.2d 1005 (1993) (holding inadmissible auto reconstruction expert's opinion that height of bumper on truck was unreasonably dangerous, where height complied with industry standards and no scientific studies or emerging consensus supported opinion); *Wood v. Toyota Motor Corp.*, 134 Md.App. 512, 760 A.2d 315 (trial judge did not err in excluding expert testimony regarding the danger of air bags because the expert 'never explained how the data upon which he relied led him to the conclusion that the size of the vent holes caused appellant's injuries'), *cert. denied*, 362 Md. 189, 763 A.2d 735 (2000); *Skrabak v. Skrabak*, 108 Md.App. 633, 673 A.2d 732 (expert's opinion regarding goodwill value of a corporation based on facts that did not support opinion and on 'guesswork and speculation'), *cert. denied*, 342 Md. 584, 678 A.2d 1048 (1996). *See also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *Dau-*

*bert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

*Days Cove Reclamation Co. v. Queen Anne's County,* 146 Md.App. 469, 488–89, 807 A.2d 156, 167 (2002). Based on the above authorities we hold that the Brill affidavit is not probative of custom.

### Absence of Evidence of Negligence

■ Even if Dodge Plaza owed a duty to patrons of Rhythms to protect them from criminal activity by third persons within the club, there is no evidence in the instant matter that Dodge Plaza breached that duty on June 10, 1995. Smith argues that, even if Dodge Plaza's allowing the Lease to continue to June 10 was not negligence, Dodge Plaza should have provided security at its expense on the night of Friday, June 9 Saturday, June 10 and charged the cost of that security to Rhythms. But, in order for there to be an actionable breach of duty by Dodge Plaza, it must have had a reasonable opportunity to correct the allegedly dangerous condition, once it had notice of it. *See 2310 Madison Ave., Inc. v. Allied Bedding Mfg. Co., Inc.,* 209 Md. 399, 407, 121 A.2d 203, 208 (1956).

Here, absent lease termination or tenant consent, Dodge Plaza ordinarily would not be authorized to send its employees onto the demised premises in order to perform duties which Rhythms' employees were to perform. Further, even if Dodge Plaza knew of the conditions in the license renewal of June 1, 1995, and knew that Rhythms did not have uniformed police officers working off-duty on Friday, June 2, any follow-up by Dodge Plaza would have revealed that off-duty police officers would be available on Friday, June 9, as represented by PGPD representatives at their meeting with King on Tuesday, June 6. It certainly was not negligence on Dodge Plaza's part to fail to have six police officers on standby on that Friday night, in the event that the police officers whom Rhythms expected to be available for its security purposes failed to appear.

For all of the foregoing reasons, summary judgment was properly entered in favor of the appellees on Smith's claim of a failure to provide security.

### Insurance

■ Article Thirteen of the Lease required the tenant to keep in force at its own expense public liability insurance with limits of $500,000/$1,000,000. . Rhythms did not comply with this provision, and Smith contends that Dodge Plaza is liable to him for failing to enforce the provision.[11] Smith's claim sounds solely in tort.[12] Smith cites no authority in support of his argument, nor does he explain precisely how Dodge Plaza was to have enforced the provision. If Smith's theory is that Dodge Plaza should have terminated the Lease, the argument fails for the reasons stated above. If Dodge Plaza had no obligation to terminate for inadequate security, *a fortiori*, it had no obligation to terminate for the absence of insurance, a breach which does not *directly* threaten bodily injury. If Smith's theory is that Dodge Plaza should have purchased insurance for Rhythms and then charged the premium to Rhythms' account, then contract law would be perverted. Dodge Plaza had the option of waiving the breach. It was not required to obtain a substitute performance and seek damages.

Accordingly, we affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED.**

**COSTS TO BE PAID BY THE APPELLANT.**

---

11. The claim is probably premature inasmuch as Smith does not assert that he has obtained a judgment against Rhythms.

12. Smith does not claim that he is a third-party beneficiary of this provision in the Lease. The intent of the provision clearly is to benefit Dodge Plaza, and, had the covenant been performed by Rhythms, Smith would have been only an incidental beneficiary. *See Marlboro Shirt Co. v. American Dist. Tel. Co.,* 196 Md. 565, 570–71, 77 A.2d 776, 778 (1951).