HEADNOTE:    KATHLEEN FORD, ET AL. V. EDMONDSON VILLAGE SHOPPING CENTER HOLDINGS, LLC, NO. 1656, SEPTEMBER TERM, 2019.

**NEGLIGENCE - - PREMISES LIABILITY- - DUTY OF CARE - - CRIMINAL ACTS OF THIRD PERSONS ON LEASED PREMISES - - STATUS OF EMPLOYEE OF TENANT ON LEASED PREMISES - - MOTION TO DISMISS.**

The appellants' decedent was killed during a robbery inside a retail store while he was working as the store manager. The store was in a strip mall in Baltimore, where there was a long history of criminal activity on the parking lot including a murder committed the month before. The decedent's widow and children brought survival and wrongful death claims in negligence against the owner of the shopping center, alleging that it knew about the criminal activity and had a duty to hire security guards and take other measures on common areas of the shopping center to protect occupants of leased premises from foreseeable criminal acts of third persons committed inside those premises.

The appellee filed a motion to dismiss asserting that it did not owe a duty of care to the decedent, as a matter of law. The circuit court granted the motion, ruling that the decedent occupied the status of tenant (not business invitee) at the time of the murder and that the shopping center did not owe a duty to protect him from the criminal acts of third persons committed on the store's leased premises. This appeal followed.

*Held*: Judgment vacated and case remanded for further proceedings.

When working inside the Dollar General store, the decedent occupied the status of tenant, not the status of business invitee. Cases concerning whether a landlord has a duty to protect a tenant from the criminal acts of third persons control. Ordinarily, when a landlord has knowledge of criminal activity on common areas that pose a risk of harm to tenants on those areas, it has a duty to take reasonable measures to eliminate conditions contributing to the criminal activity. In *Hemmings v. Pelham Wood Ltd. Partnership*, 375 Md. 522 (2003), the Court held that when a landlord knew of conditions in the common areas that had led to criminal acts inside tenants' leased premises, and took steps to correct them but failed to maintain the corrections, a duty arose to protect the tenants from the criminal acts of third persons inside leased premises that could have been averted had the corrections been maintained.

Except for one case decided on certified questions, the Maryland cases addressing whether a duty of care arose on the part of a landlord to protect a tenant from the criminal acts of third persons have been decided on summary judgment or trial records, where the facts have been fully developed. The factual record must be developed before the legal question of duty can be answered because whether such a duty arose will depend upon the factual circumstances, and in particular upon whether similar crimes had been committed

and the landlord's knowledge of such crimes.  Although the landlord tenant relationship can give rise to such a duty, whether the duty in fact arose is fact dependent. At this stage of the litigation in this case, when the factual record has not been developed, the legal question whether a duty of care was owed cannot be answered.

Circuit Court for Baltimore City
Case No. 24-C-19-000229

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1656

September Term, 2019

_____

KATHLEEN FORD, ET AL.

v.

EDMONDSON VILLAGE SHOPPING
CENTER HOLDINGS, LLC

_____

Kehoe,
Gould,
Eyler, Deborah S.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Eyler, Deborah S., J.
_____

Filed:  July 2, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This appeal stems from the tragic death of Deric Ford on August 8, 2017, inside the Dollar General store in the Edmondson Village Shopping Center ("Shopping Center"). That night, Mr. Ford was working as the store manager when he was shot and killed by one of two robbers who entered the store and held him up at gunpoint.

In the Circuit Court for Baltimore City, Kathleen Ford, Mr. Ford's wife, individually and as personal representative of Mr. Ford's estate, together with the Fords' adult children (collectively "the Fords"), the appellants, brought survival and wrongful death actions in negligence against Edmondson Village Shopping Center Holdings, LLC ("Edmondson Village"), the appellee, which owns the Shopping Center. The Fords alleged that Edmondson Village failed to take adequate security measures in common areas of the Shopping Center, causing it to become a "haven" for foreseeable violent criminal activity, and thereby proximately causing Mr. Ford's murder in the Dollar General store.

Edmondson Village moved to dismiss the complaint for failure to state a claim for which relief could be granted, arguing that as a matter of law Mr. Ford was not a business invitee and that it did not owe Mr. Ford a duty to protect him from the criminal acts of third persons inside Dollar General's leased premises. The court granted the motion.

The Fords noted this timely appeal, raising two issues, which we have rephrased and combined as follows:

> Did the circuit court err in dismissing the Fords' negligence claims on the ground that Edmondson Village did not owe Mr. Ford a duty to protect him from the criminal acts of third persons that took place on the Dollar General store premises?

We hold that when Mr. Ford was murdered inside Dollar General, his status *vis-à-vis* Edmondson Village was that of tenant to landlord. We further hold that at this stage of the litigation, the facts are not sufficiently developed to answer the legal question whether Edmondson Village owed Mr. Ford a duty to protect him from the criminal acts of third persons on the Dollar General premises, by providing security guards or other security measures in the common areas of the Shopping Center. We shall vacate the judgment and remand for further proceedings.

## STANDARD OF REVIEW

On review of the dismissal of a complaint for failure to state a claim for which relief may be granted, we accept all well-pleaded facts as true. *Wheeling v. Selene Fin. LP*, ___Md.___, No. 27, Sept. Term 2020, 2021 WL 1712318, at *5 (filed April 30, 2021); *O'Brien & Gere Eng'rs, Inc. v. City of Salisbury*, 447 Md. 394, 403-04 (2016). Like the court below, we consider the facts alleged in the operative complaint and any supporting exhibits incorporated into it. *See RRC Northeast, LLC v. BAA Maryland, Inc*., 413 Md. 638, 643 (2010). Dismissal is warranted if, even assuming the truth of all well-pleaded factual allegations and drawing all reasonable inferences from those allegations in favor of the plaintiff, the plaintiff still would not be entitled to relief. *O'Brien & Gere Eng'rs*, 447 Md. at 403-04.

Whether a complaint fails to state a claim for which relief may be granted is a question of law. *Ceccone v. Carroll Home Servs., LLC*, 454 Md. 680, 691 (2017). Accordingly, we review a circuit court's decision to grant a motion to dismiss without deference, to determine whether the ruling was legally correct. *See Lamson v. Montgomery*

2

*Cty.*, 460 Md. 349, 360 (2018); *Patton v. Wells Fargo Fin. Maryland, Inc.*, 437 Md. 83, 95 (2014).

## FACTS AND PROCEEDINGS

The First Amended Complaint is the operative pleading in this case. It contains a statement of facts and three negligence counts: a survival action by Mrs. Ford as Personal Representative of Mr. Ford's estate; a wrongful death action by Mrs. Ford; and a wrongful death action by the Ford Children.[1] The following is a summary of background information that is undisputed and facts alleged by the Fords. We know the facts are simply allegations but given our standard of review, and to provide an uncluttered recital, we state them affirmatively and quote liberally from the First Amended Complaint.

The Shopping Center is one of the oldest strip malls in Baltimore City, having opened in 1947. It consists of a long row of stores facing a terraced surface parking lot that fronts the north side of Edmondson Avenue, a main east-west artery in West Baltimore. After thriving for decades, the Shopping Center "began deteriorating, and by the turn of the century, had turned into a well-known haven for criminal activity."

"[I]n 2007, the City of Baltimore commissioned the 'Edmondson Village Area Master Plan,'" *i.e.*, "Master Plan," "in response to, including but not limited to, years of complaints surrounding the general decay and prevalence of dangerous criminal activity

---

[1] There may be only one action for wrongful death. *See* Md. Code (2006, 2013 Repl. Vol.), § 3-904(f) of the Courts & Judicial Proceedings Article ("Only one action under this subtitle lies in respect to the death of a person."). Here, the claims of the beneficiaries of a single wrongful death action are set forth in two separate counts.

occurring at the Shopping Center."[2]  "The Master Plan concluded that one of the most prevalent concerns facing the Edmondson Village area, including the Shopping Center, was drug-related criminal activity."[3]

Several years after the Master Plan was released, a "grass-roots organization" was "formed in an attempt to hold the Shopping Center accountable to the promises made in response to the Master Plan, and to push for further repairs and development."[4]  One of its primary purposes was "to thwart the rash of criminal activity at the Shopping Center." During this time, there were complaints on third-party websites about "the prevalence of criminal activity, lack of security, and general disrepair of the Shopping Center[.]"

Calls for Service Reports of the Baltimore Police Department ("BPD") show that, between January 1, 2010 and July 31, 2017, several hundred violent crimes, including "robbery, assault, aggravated assault, homicide, larceny, auto theft, and burglary[,]" "committed with a wide variety of weapons," were reported as having "occurred on and/or

---

[2] The Master Plan referenced in the First Amended Complaint is a publicly available 63-page document adopted by the Baltimore City Planning Commission on June 14, 2007. *https://planning.baltimorecity.gov/sites/default/files/EdmondsonVillageAreaMasterPlan.pdf*.  Not all the facts alleged in the First Amended Complaint and attributed to the Master Plan are supported by the Master Plan; indeed, the Master Plan diverges from the allegations in the First Amended Complaint in several respects that we need not examine in reviewing the dismissal of the Fords' claims.

[3] The Master Plan profiles four neighborhoods, giving a history and overview of each.  Rognel Heights, one such neighborhood, is located immediately west of the neighborhood the Master Plan identifies as "Edmondson."  As depicted in the Master Plan, the Shopping Center is in Rognel Heights, on its southern border, which is the north side of Edmondson Avenue (Route 40).  The Shopping Center is south of Leakin Park.  The Baltimore City/Baltimore County line is not far to its west.  *See id.* at 2, 9, 17, 18, 23, 35.

[4] The First Amended Complaint does not identify this organization.

around" the "Shopping Center property." "The Shopping Center was a petri dish for criminal activity. The absolute lack of adequate security measures provided violent criminal offenders with an open forum to engage in criminal enterprises, including but not limited to, armed robbery and homicide." "In fact, on July 21, 2017, a mere eighteen (18) days prior to the murder of Mr. Ford, a fatal stabbing, which was ultimately deemed a homicide, occurred on the Shopping Center property." "[F]or years leading up to the summer of 2017," Ira Miller, owner of Edmondson Village, "had actual and/or constructive knowledge of the persistent dangerous conditions at the Shopping Center."

On the night of August 8, 2017, Mr. Ford was at work in his position as manager of Dollar General. Shortly before 10 p.m., two individuals, at least one of them armed with a handgun, "entered the common areas of the Shopping Center" – apparently a reference to the surface parking lot – then walked up to and entered Dollar General. At that time, "inadequate security measures were in place in the common areas and/or throughout the Shopping Center, including, but not limited to, a lack of security presence and/or security guards." Upon entering, the individuals "threatened Mr. Ford with the handgun, and proceeded to rob the Dollar General." As they were leaving, but still inside the store, one robber "shot Mr. Ford, inflicting fatal injuries." At that time, "Mr. Ford was acting within the scope of his employment with Dollar General, and was lawfully on the premises of [the Shopping Center] as a business invitee and/or a tenant of the Shopping Center."

"[D]espite actual and/or constructive notice of pervasive criminal activity on the premises, [Edmondson Village] did not, and has not, ameliorated and/or otherwise changed and/or updated its security practices at the Shopping Center." Edmondson Village "knew,

5

or should have known, there was a substantial foreseeable risk of violent crimes occurring on Shopping Center property, and that there was a correspondingly high risk of individuals on the premises suffering harm as a result of such acts." Edmondson Village "failed to maintain sufficient security measures to prevent and/or deter that foreseeable harm to individuals on the premises." "The violent nature of the acts perpetrated on Mr. Ford were easily foreseeable, as crimes involving violence, perpetrated with and without weapons, were a common occurrence at and/or near the Shopping Center." Edmondson Village's "negligence caused the death of Mr. Ford, as there were no security measures to prevent or minimize the harm and risk posed to Mr. Ford as an invitee and/or tenant of" Edmondson Village.

Edmondson Village "owed Mr. Ford a duty of care commensurate with the law, including, but not limited to, ensuring his safety while an invitee and/or tenant on its property, and protecting him from foreseeable harm." It breached that duty by:

a. Failing "to protect Mr. Ford from reasonably foreseeable dangerous conditions," including "criminal activity, on [the Shopping Center's] premises of which it had actual and/or constructive knowledge and/or notice;"

b. Failing "to use reasonable care in caring for and securing public areas on the premises of the Shopping Center;"

c. Failing "to use reasonable care in maintaining, updating, and/or increasing security measures despite knowledge and/or [having] notice of the prevalence of violent crimes on the premises;"

d. Failing "to properly respond" by investigating "patron complaints regarding suspicious behavior at the Shopping Center;" and

e. Acting otherwise carelessly, recklessly, and/or negligently.

6

Finally, "[a]s a direct and proximate result of the negligent actions and/or omissions of [Edmondson Village], Mr. Ford was viciously murdered."

Edmondson Village filed a motion to dismiss, asserting that, as an employee of Dollar General, a tenant, Mr. Ford also had the status of a tenant; and as the landlord of the property, it did not owe Mr. Ford a duty to protect him from the criminal acts of third persons inside the leased premises. The Fords filed an opposition to the motion, arguing that whether Mr. Ford had the status of a business invitee on the Dollar General premises or an employee of a tenant, they had sufficiently pleaded facts that could support a duty on the part of Edmondson Village to take reasonable steps to protect Mr. Ford from foreseeable criminal activity.

The court ruled, as a matter of law, that as an employee of a tenant working inside the leased premises, Mr. Ford's status was that of a tenant, not a business invitee; and that Edmondson Village did not owe Mr. Ford a duty to protect him from the criminal acts of third persons committed inside the leased premises.

## DISCUSSION

The premises liability claims set forth in the First Amended Complaint sound in negligence. The well-established elements of that cause of action are: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of that duty." *Steamfitters Local Union No. 602 v. Erie Ins. Exch.*, 469 Md. 704, 727 (2020) (cleaned up).

7

Our focus in this appeal is on the element of duty, which is "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Pendleton v. State*, 398 Md. 447, 461 (2007) (cleaned up). Among other things, whether a duty exists "is a question of law," *id.*, that may turn on

> "[t]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved."

*Ashburn v. Anne Arundel Cty.*, 306 Md. 617, 627 (1986) (quoting *Tarasoff v. Regents of Univ. of California*, 17 Cal.3d 425, 434 (1976)).

More specifically, we are dealing with duty in the context of harm (here a fatality) caused by the criminal act of a third person. Generally,

> there is no duty to protect a victim from the criminal acts of a third person in the absence of a statute, contract, or other relationship between the party in question and the third person, which imposes a duty to control the third person's conduct, or between the party in question and the victim, which imposes a duty to protect the victim.

*Corinaldi v. Columbia Courtyard, Inc.*, 162 Md. App. 207, 219 (2005); *see also Bobo v. State*, 346 Md. 706, 715 (1997). In a premises liability case, the relationship between the defendant property owner and the plaintiff (or plaintiff's decedent) who suffered harm on the property may give rise to a duty of care relating to criminal acts of third persons. *See Southland Corp. v. Griffith*, 332 Md. 704, 719 (1993); *Corinaldi*, 162 Md. App. at 220.

"[T]he duty owed by the owner of the property to someone on the property begins with an analysis of the latter's legal status on the property at the time of the incident."

8

*Davis v. Regency Lane, LLC*, 249 Md. App. 187, 207 (2021) (cleaned up). The status of one entering on property, and the corresponding duty that may arise, is a function of Maryland common law. In the case at bar, where the defendant is the owner of a commercial shopping center and a landlord of some premises within the Shopping Center, we are dealing with two types of legal statuses, depending upon the underlying situation: 1) landlord and tenant, and 2) property owner and business invitee.

A landlord that has leased portions of its property to tenants remains responsible for the areas it has not leased and retains control over for the use in common of its lessees, *i.e.*, common areas. *See id.* As property owner, the landlord's duty of care to one entering on a common area depends upon the status of the person at the time. Outside the context of criminal acts of third persons, the landlord owes to those invited on the common areas, such as customers of a commercial property, tenants of residential properties, and employees of tenants of commercial properties using the common areas, the duty owed to an invitee: to use "reasonable and ordinary care to keep the premises safe[.]" *Macke Laundry Serv. Co. v. Weber*, 267 Md. 426, 429, 432-33 (1972) (landlord liable for injuries sustained by tenant's child due to landlord's negligence in maintaining dryer in laundry room of apartment complex). *See also Shields v. Wagman*, 350 Md. 666, 672 (1998) (landlord has duty to exercise reasonable care for safety of tenants and their guests in common areas); *Langley Park Apts. v. Lund Adm'r*, 234 Md. 402, 409-10 (1964) (landlord liable for injuries sustained by tenant from accumulation of snow in common area). *See also Davis*, 249 Md. App. at 207, 212-13 (negligence claim against landlord by tenant and his guest shot in apartment complex parking lot, predicated on "evidence of repeated

9

instances of dangerous criminal activity on the premises," including calls to police "in the three years prior to the shooting" that reported assaults, shootings, and "drug-related activity").

In a strip mall such as the Shopping Center, the surface parking lot where customers and workers park their vehicles and across which they walk to enter the stores is a common area. *See Shields*, 350 Md. at 681; *Honolulu Ltd. v. Cain*, 244 Md. 590, 595-97 (1966). On a common area controlled by the landlord, an invitee of a tenant is an invitee of the landlord because the tenant's invitee is on the common area with the consent of the tenant. *See Davis*, 249 Md. App. at 207; *Murray v. Lane*, 51 Md. App. 597, 601-03 (1982).

A tenant to whom the landlord has leased premises "'acquires an estate in the land, and becomes for the time being, both owner and occupier, subject to all of the responsibilities of one in possession, to those who enter upon the land and those outside of its boundaries.'" *Smith v. Dodge Plaza Ltd. P'ship*, 148 Md. App. 335, 347 (2002) (quoting *Henley v. Prince George's Cty.*, 305 Md. 320, 337 (1986)). As lessee, the tenant receives an exclusive right to possession of the leased premises. *Kessler v. Equity Mgmt., Inc.*, 82 Md. App. 577, 586 (1990). *See also Uthus v. Valley Mill Camp, Inc.*, 472 Md. 378, 391 (2021). Under the common law, "a landlord is not ordinarily liable to a tenant or guest of a tenant for injuries from a hazardous condition in the leased premises that comes into existence after the tenant has taken possession." *Matthews v. Amberwood Assocs. Ltd. P'ship, Inc.*, 351 Md. 544, 555 (1998). And as one in a position of owner and occupier of the leased premises, the tenant owes a duty of care to those he invites inside his premises. *Id. See Hemmings v. Pelham Wood Ltd. Liab. Ltd. P'ship*, 375 Md. 522, 538 (2003);

10

*Marshall v. Price*, 162 Md. 687, 689 (1932). In the case of a commercial tenant in a shopping center or strip mall, the customers the tenant invites into his store ordinarily occupy the status of business invitees. *Matthews*, 351 Md. at 554; *Norris v. Ross Stores, Inc.*, 159 Md. App. 323, 334 (2004).

In addition to the landlord-tenant relationship prescribed by Maryland common law, "[t]he legal relationship between landlord and tenant is governed by the contract between the parties, as well as any statutory authority." *McDaniel v. Baranowski*, 419 Md. 560, 574 (2011) (cleaned up). Thus, common law duties can be added to or altered by the terms of a lease or by relevant statutory impositions. For example, in *Matthews*, 351 Md. at 548-50, a residential lease included a "no pets" clause that authorized the landlord to remove pets or to evict tenants for violating that clause. The landlord knew its tenant was keeping a dog with dangerous propensities in her apartment but did not take action. After the dog killed the child of a visitor inside the tenant's apartment, the visitor sued the landlord for negligence. The case went to trial and the jury found the landlord liable. Reversing this Court's conclusion that the landlord "owed no duty to the social invitees of a tenant[,]" the Court of Appeals held that, although under Maryland common law a landlord ordinarily is not liable for injuries caused by a dangerous or defective condition inside leased premises, the landlord's knowledge of the dog's dangerousness, which made an attack by the dog reasonably foreseeable, and the "no pets" clause, which empowered the landlord to remove the dog, together created an exception and imposed a duty on the landlord to protect those entering the tenant's apartment from being attacked by the dog. *Id*. at 552, 565-66, 570.

11

*Scott v. Watson*, 278 Md. 160 (1976), is the seminal Maryland case about a landlord's duty to protect tenants from the criminal acts of third persons. The Court of Appeals answered certified questions from the United States District Court for the District of Maryland in a wrongful death action brought by the beneficiaries of a tenant who was shot and killed in the underground parking garage of his Baltimore City apartment building. Among the questions the federal court asked was "[w]hether a duty is imposed upon the landlord to protect his tenants from criminal acts of third parties where he has knowledge of increasing criminal activity on the premises, or in the immediate neighborhood[.]" *Id.* at 168.

At the outset, the Court explained that Maryland common law has not recognized a "special relationship" between a landlord and tenant that would impose a duty on the landlord to protect the tenant from the criminal acts of a third person. *Id.* at 166-67.[5] The Court declined to impose such a special duty, because "to do so would place [a landlord] perilously close to the position of insurer of his tenants' safety." *Id.* at 167.

Nevertheless, the Court held, depending on the landlord's state of knowledge of dangerous circumstances in common areas, a duty of care *may* come into being. "If the landlord knows, or should know, of criminal activity against persons or property in the

_____

[5] The Court cited the *Restatement (Second) of Torts* § 315 (1965), which provides, as the Court put it, that there is "no duty to control third person's conduct so as to prevent physical harm to another unless a special relation exists between actor and third person, or between actor and the other." *Scott*, 278 Md. 160, 166 (1976). In *Lamb v. Hopkins*, 303 Md. 236, 245 (1985), the Court held that section 315 is the "appropriate analytical framework for determining whether an actor has a duty to control a third person" in Maryland.

common areas, [the landlord] then has a duty to take reasonable measures, in view of the existing circumstances, to eliminate the conditions contributing to the criminal activity." *Id*. at 169. Thus, the landlord's knowledge is critical to whether a duty will exist. Moreover, recognizing that a landlord "can affect the risk only within his own premises," the Court held that "ordinarily only criminal acts occurring on the landlord's premises, and of which he knows or should have known (and not those occurring generally in the surrounding neighborhood) constitute relevant factors in determining, in the particular circumstances, the reasonable measures which a landlord is under a duty to take to keep the premises safe." *Id.*

In *Scott*, the landlord's acts and omissions, the criminal act of the third person, and the tenant's death all took place in a common area controlled by the landlord. Several decades later, the Court examined the duty element of negligence where the landlord's acts and omissions took place in a common area, but the criminal act and the death took place inside the tenant's leased premises. Like *Scott*, *Hemmings v. Pelham Wood Ltd. Liab. Ltd. P'ship,* 375 Md. 522, involved a residential apartment complex. The landlord received complaints from tenants about burglaries in which intruders had forced their way into apartments through sliding glass doors. Evidence generated in discovery showed that in order to deter "drug use in common areas" and frequent violent crime "within apartment units[,]" the landlord installed security lights in exterior common areas. *Id*. at 531. It failed to keep the lights in working order, however. An intruder managed to traverse a common area undetected, force open an apartment's sliding glass door, enter the apartment, and shoot and kill the tenant. The tenant's beneficiaries brought a wrongful death action for

13

negligence against the landlord. Summary judgment was granted for the landlord on the issue of duty of care and an appeal followed.

Echoing *Scott*, the Court in *Hemmings* stated,

> [a] landlord has a legal duty to take reasonable security measures within the common areas when: (1) the landlord had knowledge or should have had knowledge of criminal activity having taken place on the premises, and (2) a landlord of ordinary intelligence, based on the nature of the past criminal activity, should have foreseen the harm suffered.

*Id*. at 546. It added, "Once a landlord takes reasonable security measures to eliminate conditions that contribute to criminal activity on the premises," it "has a continuing obligation to properly carry out the security measures it provides." *Id*. (citing *Scott*, 278 Md. at 171). "'[E]ven if no duty existed to employ the particular level of security measures provided by [a landlord], improper performance of such a voluntary act could in particular circumstances constitute a breach of duty.'" *Id*. (quoting *Scott*, 278 Md. at 171). Thus, whether a duty arises on the part of the landlord to protect tenants from criminal acts of third persons, and the scope of any such duty, may be affected when the landlord voluntarily undertakes security measures in common areas of its property.

Of most significance to the case at bar, the *Hemmings* Court recognized that "a landlord's negligent maintenance of a common area may lead to liability for criminal acts *within a leasehold*." *Id.* at 545 (emphasis added.) As noted, in general, a landlord is not responsible for injuries inside a tenant's premises. However, "a landlord is not necessarily immune from liability because a tenant's injury occurs *within* a leased premises, rather than within common areas, *if an uncorrected defect in the common area adversely affects occupants of the leased premises*." *Id*. at 542 (emphasis added). The Court concluded that

14

on the facts in the summary judgment record, the landlord owed the tenant a duty to protect him from harm perpetrated inside his apartment by an intruder whose presence there would have been averted had the security lights been operational.[6]

Two years after deciding *Hemmings*, the Court of Appeals again considered the duty element of negligence in the context of an attack on a tenant by a third person inside the leased premises. In *Rhaney v. Univ. of Maryland*, 388 Md. 585, 589 (2005), the plaintiff, a student, was living in a dormitory room on campus. He and his assigned roommate did not get along and the roommate was in the process of moving out. When they got into an argument over a fish tank, the roommate sucker punched the student, breaking his jaw. University personnel knew before that incident that the roommate had been involved in a prior assault but did not inform the student about that.

The student sued the University for negligence. The case went to trial and a jury returned a verdict in his favor. Ultimately, the Court of Appeals reversed the judgment on

---

[6] In *Smith v. Dodge Plaza Ltd. P'ship*, 148 Md. App. 335 (2002), a patron of a nightclub was stabbed by another patron, inside the nightclub. The nightclub was in leased premises at a strip mall. The lease specified that the premises were to be used as a nightclub and prohibited certain behavior. There was no evidence in the summary judgment record of any negligent act or criminal act in a common area of the strip mall. Nor was there any evidence that the landlord, which owned the strip mall, knew the nightclub owner was violating the lease by failing to provide adequate security. The circuit court granted summary judgment to the landlord on the ground that it did not owe a duty of care to the injured nightclub patron. *Id*. at 339. We affirmed, holding that the landlord did not owe a duty to furnish security inside the tenant's premises to protect against criminal acts of third persons. *Id*. at 337, 347, 356. *Cf. Troxel v. Iguana Cantina*, 201 Md. App. 476, 498-99, 502-03 (2011) (nightclub patron who was attacked by another patron inside nightclub sued the nightclub owner for negligently failing to take steps to prevent assault; summary judgment for nightclub owner on issue of duty reversed based on evidence of prior incidents of similar violence).

15

the ground that the University did not owe the student a duty to protect him from the criminal act of his roommate committed inside his dormitory room. The Court determined that while inside his dormitory room, the student's status was that of a tenant, not a business invitee. It recognized that the student's status could change depending upon his location on campus; some places on campus he would be an invitee. But for purposes of the case before it, the student was a tenant in his dormitory room.

Clarifying its holding in *Hemmings*, the Court explained:

> [W]e articulated [in *Hemmings*] the general principle that a landlord "has no obligation to maintain the leased premises for the safety of the tenant." In certain circumstances, a duty to a tenant in the leased premises may arise out of dangerous and defective conditions within the common areas controlled by the landlord, but only in a narrow context – the landlord must have actual knowledge of activity taking place in the common areas that may affect the demised premises or, in the alternative, the landlord should have had such knowledge and foreseen the harm suffered.

*Id*. at 598 (quoting *Hemmings*, 375 Md. at 546). In other words, for a landlord to owe a tenant a duty to protect him from harm inside the leased premises caused by a dangerous or defective condition/activity that exists outside the leased premises, in the common area, the landlord either must know about the condition/activity in a common area that may affect the leased premises *or* should have known about it and foreseen that it would cause harm to a tenant inside the leased premises.

In analyzing whether the University, as landlord, owed a duty to protect the student, as tenant, from criminal acts of a third person inside the leased premises, the *Rhaney* Court made two "threshold determinations." *Id*. at 599. First, it considered whether the roommate himself was a "dangerous condition" and concluded he was not. The Court

16

emphasized that in a premises liability case, a person committing a criminal act is not a dangerous or defective condition. Rather, a dangerous or defective condition is a physical state of the property that contributes to criminal activity and that, in view of existing circumstances and knowledge, the landlord has a duty to take reasonable measures to eliminate.

Second, and finally, the Court explained that even if the roommate were to be considered a dangerous condition, there was no evidence that the University's "knowledge of [the roommate's] relevant past activities" would have enabled it to foresee that he would attack the student. *Id*. There was "no pattern of sufficient prior violence on [the roommate's] part in circumstances similar to what ultimately happened[,]" and no "actual knowledge of [the roommate's] propensity to assault and batter his future roommate[.]" *Id*. at 603, 599.[7]

---

[7] *Corinaldi v. Columbia Courtyard, Inc.*, 162 Md. App. 207 (2005), concerned whether a hotel owner owed a duty of care to protect a friend of a hotel guest from the criminal acts of a third party inside the guest's hotel room. The friend, a business invitee, was fatally shot in that room. His survivors sued the hotel for negligence, and the circuit court granted summary judgment in favor of the hotel. We reversed on the ground that there was record evidence that the hotel "had knowledge of events occurring on the premises, prior to and leading up to the assault, which made imminent harm foreseeable." *Id*. at 224. Specifically, hotel workers knew of a gathering in the guest's room and were told that a person in the guest's room had a gun. From those facts, we observed that "a reasonable jury could find that imminent harm was foreseeable" to the hotel. *Id*. at 228. We explained that, unlike cases in which a possessor of land is sought to be held liable based on a duty arising from knowledge of prior similar incidents, the duty of the hotel owner was based on "knowledge of facts relating to the incident in question[.]" *Id*. at 223.

*__Mr. Ford's Status on the Premises Leased to Dollar General__*

In granting Edmondson Village's motion to dismiss, the circuit court ruled that Mr. Ford's status on the Dollar General premises when he was killed was that of a tenant, not a business invitee. We conclude that the facts alleged in the First Amended Complaint, accepted as true for purposes of a motion to dismiss, are sufficient to ascertain Mr. Ford's status on the Dollar Store premises *vis-à-vis* Edmondson Village at the time of the shooting, and we agree that his status was that of a tenant.

There is no dispute that Dollar General was a tenant of Edmondson Village, operating its store out of leased premises. As recounted above, when he was killed, Mr. Ford was inside Dollar General working in his capacity as store manager. The Fords maintain that two cases support their position that he was a business invitee of Edmondson Village at the time. In *Doe v. Montgomery Mall, LP*, 962 F.Supp. 58, 60 (D. Md. 1997), an employee of a shopping mall tenant was kidnapped, robbed, and raped in a garage where employees were required to park. The federal district court denied a motion for summary judgment filed by the mall owner based on proximate cause, citing a dispute of material fact over the sufficiency of security measures taken to deter this type of criminal activity based on the foreseeability of the attack. In *Young v. Prizm Asset Mgmt. Co.*, 100 A.3d 594 (Pa. Sup. Ct. 2014), an employee of a shopping mall tenant was assaulted in a mall parking garage. The appellate court reversed the grant of summary judgment for the mall owner, holding that the employee was a business invitee when she was in the garage because "a mall exists to profit from providing merchants with a location to conduct

18

business, and merchants cannot reasonably conduct business without the assistance of employees[.]" *Id*. at 597.

Neither case supports the Fords' position, for several reasons, foremost of which is that in each it was undisputed that the attack on the tenant's employee was perpetrated in a common area retained by the mall owner and kept under its control. To the extent the issue of the duty owed by the landlord was before those courts, the status of the plaintiff, an employee of a mall tenant, turned on his or her presence on a common area of the mall owner's property. By contrast, the status question here turns on Mr. Ford's presence inside a tenant's leased premises, as an employee of the tenant.

While at work as the manager inside Dollar General, Mr. Ford was not a customer invited to the Shopping Center by Edmondson Village, its owner, to patronize businesses there; nor was he a customer of Dollar General invited inside to patronize it. He was an employee of the tenant, *i.e*., an agent of Dollar General. In Maryland premises liability cases involving common areas retained by a landlord, over which the landlord has kept control, the Court of Appeals has held that the duty the landlord owes to the tenant in those common areas, it also owes to the tenant's family members, guests, invitees, and other people on the common area by virtue of the tenant's right to be there. *See Landay v. Cohn*, 220 Md. 24, 27 (1959). And in *Matthews*, 351 Md. at 555, where an exception to the general principle that a landlord does not owe a duty to keep leased premises safe was found to apply, the duty the Court of Appeals determined the landlord owed to the tenant was the same duty it owed to social guests of the tenant. *See also Davis*, 249 Md. App. at 207 (because victims shot in apartment parking lot were a tenant and his guest, "their legal

19

status generally would be that of an invitee, resulting in [the landlord] owing them a duty to exercise reasonable care for their safety.")

Although there is no Maryland case directly on point, other courts have held that for purposes of premises liability, an employee of a commercial tenant has the same status on the leased property as the employer-tenant itself. In *Ann M. v. Pacific Plaza Shopping Ctr.*, 6 Cal.4th 666, 675 (Cal. 1993), *disapproved on other grounds*, *Reid v. Google, Inc.*, 113 Cal. Rptr.3d 327 (Cal. 2010), an employee working at a photography store in a strip mall was raped by a man who entered the store on the pretext of being a customer. The California Supreme Court held that the employee's status *vis-à-vis* the strip mall owner was that of a tenant to a landlord. It explained that, in a "commercial context where the tenant generally is not a natural person and must, therefore, act through its employees, it cannot be seriously asserted that a tort duty that a landlord owes to protect the personal safety of its tenant should not extend to its tenant's employees." *Id.* *See also Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 23 (Tex. 1993) (in negligence action against lessor of service station for personal injuries sustained by employee of service station lessee in attempted robbery, landlord's "right to control the security of the station" controlled its "duty to provide the same" for benefit of tenant's employee). As the Eighth Circuit Court of Appeals said long ago,

> The general rule is well settled that the duties and liabilities of a landlord to persons on the leased premises by the invitation of the tenant are the same as those owed to the tenant himself. A subtenant, servant, employee, or guest of the tenant is ordinarily held to be so identified with the tenant that his right of recovery for injury as against the landlord is the same as that of the tenant would be had he suffered the injury. This is true because

such persons enter under the same title as the lessee, and not at the invitation express or implied of the landlord.

*Fraser v. Kruger*, 298 F. 693, 696 (8th Cir. 1924).

In the case at bar, Mr. Ford entered Dollar General's leased premises at Dollar General's invitation, to work for Dollar General, and he was fulfilling that purpose when he was killed during a robbery inside the store. He was not invited to work inside the leased premises by Edmondson Village and he did not enter the leased premises as a customer.

As the Court in *Rhaney* made clear, the status of a plaintiff (or plaintiff's decedent) on property may change depending upon where he or she is located on the owner's property at the time of the attack. *See Rhaney*, 388 Md. at 602. Mr. Ford may well have been a business invitee of Edmondson Village had he been located on a common area of the Shopping Center when he was shot and killed. *See Matthews*, 351 Md. at 554-55 (tenant and tenant's guest were business invitees in common areas of apartment complex but not when inside tenant's apartment). That is not the issue. The issue is his status while working for a tenant inside the tenant's leased premises. Given his location and the purpose he was serving while there, it only makes sense that Mr. Ford would take on the status of his employer, *i.e.*, that of a tenant.

### *Did Edmondson Village Owe a Duty of Care to Protect Mr. Ford from the Criminal Acts of Third Persons Inside Dollar General?*

Relying primarily on *Rhaney*, the circuit court went on to rule that on the facts alleged, Edmondson Village did not owe Mr. Ford a duty to protect him from the gunman's criminal attack inside the leased premises. We disagree that the legal question whether

21

Edmondson Village owed Mr. Ford a duty of care can be answered at this stage of the litigation. It may be that no such duty of care arose, but that cannot yet be determined.

Under *Hemmings* and *Rhaney*, when a landlord-tenant relationship exists, a duty *may arise* on the part of the landlord to maintain common areas so as to protect tenants from the criminal acts of third persons inside leased premises. Whether the duty *actually arises* depends upon the facts of the particular case, especially those relating to the state of the landlord's knowledge. It is not a coincidence that with the exception of *Scott*, in which the Court was answering certified questions, the Maryland premises liability cases on duty to protect from criminal acts of third persons all have been decided on developed summary judgment or trial records. *See Rhaney*, 388 Md. at 603 (landlord/tenant, reversing jury verdict based on "insufficient evidence of a breach of the duty of reasonable and ordinary care"); *Hemmings*, 375 Md. at 548 (landlord/tenant, grant of summary judgment reversed and remanded based on evidence that landlord may have breached its "duty to adequately maintain" security lighting in common areas); *Davis*, 249 Md. App. at 214-16 (landlord/tenant and landlord/tenant's invitee, summary judgment improperly granted on duty but affirmed on proximate causation because plaintiffs "produced no evidence regarding the circumstances of the shooting" and "no evidence to support a finding that extra security patrols or other security measures could have prevented the shooting"); *Evergreen Assocs., LLC v. Crawford*, 214 Md. App. 179, 191 (2013) (landlord/tenant, affirming summary judgment for tenant because "the facts of the instant case do not warrant the recognition of a duty by [Crawford] to Evergreen to safeguard the leased premises from the criminal act of arson by unknown third parties"); *Troxel v. Iguana*

22

*Cantina*, 201 Md. App. 476, 502-03 (2011) (tenant/business invitee, reversing summary judgment for tenant in suit by business invitee who was attacked in leased premises by another business invitee, because "[a] fact finder could reasonably conclude that Iguana Cantina, given the history of criminal conduct occurring within its premises, breached its duty to provide adequate security to protect its patrons from violent attacks"); *Corinaldi*, 162 Md. App. at 228 (innkeeper/business invitee, reversing summary judgment for innkeeper against guest of guest who was shot in hotel room based on evidence that hotel employee delayed calling police after being "advised that someone had a gun"); *Smith v. Dodge Plaza Ltd. P'ship*, 148 Md. App. 335, 355 (2002) (business invitee of tenant/landlord, affirming summary judgment for landlord based on lack of evidence landlord breached a duty to business invitee of tenant to protect him from assault by another invitee inside tenant's leased premises). *Cf. Matthews*, 351 Md. at 570 (landlord/guest of tenant, upholding jury verdict in favor of parents whose child was killed by tenant's dog in leased premises, based on evidence of landlord's knowledge of dog's dangerousness and failure to enforce "no pets" clause in lease); *Shields*, 350 Md. at 685 (landlord/tenant/business invitee, reversing directed verdict in favor of strip mall landlord because there was "sufficient evidence of knowledge in this case to go to the jury" on whether landlord breached duty to protect tenant/invitee from being attacked in common area by another tenant's dangerous dog).

In one case involving harm caused by the criminal act of a third person, *Valentine v. On Target*, 353 Md. 544, 547 (1999), the Court affirmed the grant of a motion to dismiss a negligence action for lack of duty as a matter of law. A gun was stolen from a gun store

23

and later used by an unknown assailant to shoot and kill a victim at a location other than the gun store. The husband of the deceased shooting victim sued the gun store for negligence, alleging that its owner owed a duty "to exercise reasonable care in the display of handguns held out to the public for sale to prevent theft and illegal use of . . . handguns" against third persons. *Id.* There was no relationship between the owner of the gun store and the shooting victim that could give rise to a duty to either the victim or to "the world at large" to protect against criminal acts by third parties. *Id.* at 553. Explaining that the duty element in a negligence claim must be "to the person injured[,]" the Court concluded that the facts alleged could not show that the gun store was "'under any obligation for the benefit of the particular plaintiff,'" that is, the decedent. *Id.* at 550 (quoting W. Page Keeton *et al.*, *Prosser and Keeton on the Law of Torts*, § 30, at 356 (5th ed. 1984)).

In the instant case, the First Amended Complaint, although containing some allegations that may not withstand discovery and others that are not relevant, sets forth a bare minimum of facts that, if sufficiently developed during discovery, could support a duty of care. The Fords allege that Mr. Ford had a relationship with Edmondson Village that is recognized by Maryland law. (As explained above, that relationship is landlord-tenant.) They further allege that for many years, violent criminal acts were perpetrated on the parking lot of the Shopping Center, including a murder the month before Mr. Ford was killed, and that Edmondson Village knew that such crimes were happening.

In *Hemmings*, the landlord's duty to protect tenants from criminal acts inside their apartments arose because the landlord had received information that criminal conduct in common areas had resulted in crimes inside apartments and, after installing lighting to deter

24

such crimes, had failed to keep the lighting in operation. In *Rhaney*, no duty existed because there was no dangerous and defective condition on any property and even if there were, there were no prior similar criminal acts that would have put the landlord on notice that a crime such as the one that was carried out by the roommate was likely to be perpetrated. In those cases, decided on a summary judgment record and a trial record, respectively, the facts were fully developed, allowing the legal question of duty to be answered.

Whether Edmondson Village had a duty to maintain the common areas of the Shopping Center so as to protect Mr. Ford from being shot and killed inside Dollar General's premises depends upon a host of facts that are undeveloped at this time. Just a few categories of relevant facts are the terms of the lease between Edmondson Village and Dollar General; the number and type of criminal acts perpetrated on the Shopping Center parking lot (or other common area); whether those crimes were similar to the crime committed against Mr. Ford and whether they made it reasonably foreseeable that a tenant would be the victim of a similar crime inside a store; precisely what Edmondson Village actually knew or should have known about those acts; and whether Edmondson Village adopted any security measures for the purpose of protecting tenants inside their stores and, if so, whether it maintained those security measures.

Beyond these most basic facts, which are not all encompassing, there are additional facts relevant to the many policy considerations that are part of the calculus of whether a duty arose, especially if the duty, as alleged, is to hire security guards in the common areas. As the Court in *Ashburn v. Anne Arundel Cty.*, 306 Md. at 627, recognized in quoting from

25

the well-known *Tarasoff* case, foreseeability of harm to the plaintiff, burden to the defendant, and consequences to the community are among the factors to be weighed in deciding whether a duty exists.

In *Ann M. v. Pacific Plaza Shopping Ctr.*, 6 Cal.4th at 679-80, discussed above, for instance, the California Supreme Court, reviewing the case on a summary judgment record, considered those factors in holding that the shopping center owner did not have a duty to hire security patrols in common areas to protect the plaintiff from being raped inside the store where she worked. The court reasoned, as it had in earlier cases, that foreseeability of harm and burden of preventing harm are related. *Id*. at 678-79. Pointing out that hiring security guards "will rarely, if ever, be found to be a 'minimal burden[,]'" given the cost, and that "the social costs of imposing a duty on landowners to hire private police forces" are not insignificant, the court concluded that

> …. a high degree of foreseeability is required in order to find that the scope of a landlord's duty of care includes the hiring of security guards […and] the requisite degree of foreseeability rarely, if ever, can be proven in the absence of prior similar incidents of violent crime on the landowner's premises. To hold otherwise would be to impose an unfair burden upon landlords and, in effect, would force landlords to become the insurers of public safety, contrary to well-established policy in this state.

*Id*. at 679 (citations and footnote omitted).

In that case, the California Supreme Court "conclude[d] that violent criminal assaults were not sufficiently foreseeable to impose a duty upon" the owner of the shopping center "to provide security guards in common areas" because it "did not have notice of prior similar incidents occurring on the premises." *Id*. "[E]ven assuming that [the shopping center owner had notice of" previous assaults and robberies, the court stated,

26

those crimes "were not similar in nature to the violent [sexual] assault" on the tenant's employee. *Id*. at 680.

At this very early stage of litigation in the case at bar, the facts that will have a bearing on whether a duty exists – including a duty to provide security guards, which features prominently in the First Amended Complaint – and, if it does, whether any breach of duty proximately caused Mr. Ford's death, have yet to be gleaned through discovery. When they are, summary judgment may be appropriate – or it may not. The duty question simply cannot be decided on the existing undeveloped record.

**JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEE.**